**James C. HOBBS, Plaintiff,**

v.

**WISCONSIN POWER AND LIGHT COMPANY, and The William Powell Company, Defendants.**

**Civ. No. 2188.**

United States District Court
W. D. Wisconsin.

Sept. 25, 1956.

Richey & Watts, Cleveland, Ohio, Spohn, Ross, Stevens & Lamb, Madison, Wis., for plaintiff.

Schubring, Ryan, Petersen & Sutherland, Madison, Wis., for defendant Wisconsin Power & Light Co.

Haight, Goldstein & Haight, Chicago, Ill., Stroud, Stebbins, Wingert & Stroud,

---

24. Flack's Ann.Code 1951, Art. 23, § 78. See also Johnson-Battle Lumber Co. v.

Emanuel Lumber Co., 1925, 33 Ga.App. 517, 126 S.E. 861.

Madison, Wis., Zugelter & Zugelter, Cincinnati, Ohio, for defendant Wm. Powell Co.

STONE, District Judge.

### Findings of Fact

1. This is a patent infringement action brought by the individual patentee, James C. Hobbs, a resident of Coral Gables, Florida, against Wisconsin Power and Light Company, a Wisconsin corporation, and The William Powell Company, an Ohio corporation, defendants, charging infringement of Patents Re. 23,272 and Re. 23,137. This Court has jurisdiction of the subject matter and of the parties and the venue is proper.

2. United States Patent Re. 23,272 was granted on September 26, 1950 on an application filed April 29, 1950 for reissue of Patent No. 2,321,597 dated June 15, 1943, which was granted on an application filed on February 23, 1940.

3. United States Patent Re. 23,137 was granted on July 26, 1949 on an application filed May 26, 1949 for reissue of Patent No. 2,443,187, dated June 15, 1948, which was granted on an application filed on August 15, 1944.

4. The plaintiff is the owner of Patents Re. 23,272 and Re. 23,137.

5. Patent Re. 23,272 deals with a "Valve Construction" and Patent Re. 23,-137 deals with a "Pipe Coupling". Both patents are charged to be infringed by valves made and sold by the defendant, The William Powell Company to defendant, Wisconsin Power and Light Company.

6. Patent Re. 23,272 relates to valves for controlling flow of high pressure fluids, and steam. It discloses a valve having conventional valve parts in which the opening, through which the internal parts are inserted, is sealed with a pressure sealing joint. Such valves include a body having a passage therethrough with inlet and outlet openings, a valve disk or plug within the body carried by a stem and movable to different positions to open, close, or partially close the fluid passage through the body, and an access opening in the body large enough to permit the insertion and removal of the valve disk and associated parts. The access opening must be closed and sealed against leakage of the high pressure, high temperature fluid entering or passing through the valve, and must be capable of being readily opened for inspection, cleaning, repair and replacement of parts. The closure must support and guide the valve stem, and therefore must be positively held in correct position and alignment on the valve body.

7. Valve constructions in common use prior to February, 1938, included valves having a metal body with a valve seat and an opening through which the interior parts of the valves were inserted; one or more members (sometimes referred to as the bonnet) closing the opening in the valve body, packing, a gasket or other sealing means between the body and one of the closure members, a valve disk, plug or wedge insertable through the opening and engageable with the valve seat to regulate flow of fluid through the valve; a valve stem connected to the valve disk, plug or wedge; a packing around the valve stem; a yoke arm supported by the body, the yoke arm in turn supporting means outside of the body for moving the valve stem to seat and unseat the valve disk, plug or wedge; and means for preventing relative rotation of the valve stem and its guiding members.

8. Prior to February, 1938, check valves in common use included valves having a metal body with a valve seat and an opening through which the interior parts of the valve were inserted; one or more members (sometimes referred to as the "bonnet") closing the opening in the valve body; packing, a gasket or other sealing means between the body and one of the closure members; a valve disk, plug, or wedge insertable through the opening and engageable with the valve seat to regulate flow through the valve; a valve stem slidable in one of the valve closing members and operatively associated with the valve disk or plug; and means for preventing the relative rota-

tion of the valve stem and its guiding member or members.

9. Prior to February, 1938, valves in common use employed various types of joints between the body and the member or members closing the opening in the body through which the internal parts of the valves were inserted. Such different types of joints included flanged bonnet joints, welded bonnet joints, screwed bonnet joints, and union bonnet joints.

10. Prior to February, 1938, valves incorporating pressure seals at the valve receiving opening of the body were known to the art. Examples of such valves are the Forbes Patent No. 1,631,-586, the Heine German Patent No. 511,-843, and the Cocard Italian Patent No. 327,289.

11. The fluid pressure within the bolted bonnet valves exerted a pressure load on the bonnet tending to force it away from the body equal to the pressure of the fluid in pounds per square inch multiplied by the number of square inches of area of the bonnet within the circle of the packing material. This load acted in a direction to stretch the bolts and force open the joint between the body and bonnet and to permit leakage, requiring a tightening of the bolts to stop the leakage.

12. Forces in the valve stem created either by opening or closing the valve or by differential expansion or contraction between the valve stem and the valve body reacted through the bonnets of the bolted bonnet valves and were transmitted to the body through the bolts. Extremely high forces, created by expansion of the stem when a valve containing hot fluid was closed, acted in the direction to pull the bonnet from the body, stretch the bolts and open the joint to permit leakage, requiring a tightening of the bolts to stop the leakage.

13. Bolted bonnet valves used for high temperature, high pressure fluids also develop leaks from "creep" or elongation of metal under load at high temperatures, requiring a tightening of the bolts to stop leakage.

14. The high temperature, high pressure fluids of a steam power plant are extremely dangerous if permitted to escape, without restraint.

15. Efforts to avoid the leakage from bolted bonnet valves involved attention and inspection and frequent re-tightening of the individual bolts to correct any stretching and creep which had occurred.

16. It has long been known that the efficiency of steam power plants, that is, the amount of power that could be generated with a given amount of fuel, could be increased by generating the steam at higher pressures and temperatures.

17. Bolted bonnet valves were used prior to the date of the issue of the patents herein on higher pressures and temperatures by increasing the thickness of the walls, the thickness and size of the flanges, and the number and size of the bolts.

18. Prior to the issue of the patent in suit there had been a need for valves which would overcome the leakage and maintenance problem, which would permit the use of higher pressures and temperatures to achieve maximum efficiency in steam power generation, which would reduce the weight and bulk of the valves then being used, and which would reduce the wall thickness so as to reduce the stresses created by temperature changes and differentials.

19. The plaintiff, James C. Hobbs, after studying and teaching mechanical engineering at Carnegie Institute of Technology, started in 1911 working in the operation and design of steam power equipment and has continued that work ever since. He first encountered the leakage and maintenance problem of bolted bonnet valves in 1911. While working with the Diamond Alkali Company at Painesville, Ohio, he designed and built in 1928 and in 1933 to 1934, two steam power plants to generate steam at substantially higher temperatures and pressures than those theretofore used by that company. The second of these plants generated steam at 800 pounds per square inch pressure and 800°F. At that time Mr. Hobbs knew that he could

achieve a great advantage in efficiency by going to still higher pressures and temperatures.

20. In the patent in suit the valve body is provided with a valve receiving opening and a valve seat. An outer member or abutment ring is secured to the body and projects into the valve receiving opening. A hollow inner guiding and clamping member is positioned within the valve receiving opening and telescoped with the outer member. Annular packing is disposed against the wall of the valve receiving opening and between axially opposed surfaces formed by the outer member and by a flange on the inner member. Force applying rings or nuts are screwed on the inner member and press against the outer member to pull the inner member axially outward and compress the packing against the wall of the valve receiving opening. Fluid pressure within the valve causes the inner member to slide outwardly a slight amount and increase the compression of the packing, so as to prevent leakage at all pressures without misaligning the valve stem with the seat. The valve body, and the inner member with the valve stem guided therein, are free to expand and contract independently without creating any forces tending to open the joint or cause leakage. The valve eliminates leakage and lessens the maintenance problem. In the form shown in Fig. 2 the reaction forces from the valve stem are transmitted to the outer member and the body so that none of these forces can act on the packing in a direction to open the joint or cause leakage.

21. Feed water and steam valves embodying the invention of Patent No. Re. 23,272 were tried out in a plant designed and built by plaintiff for Diamond Alkali Company at Painesville, Ohio, for generating steam at a pressure of 2,300 pounds per square inch and a temperature of 950°F. These valves were built by defendant Powell. Requests for bids were sent out to leading valve manufacturers. All except defendant who responded proposed bolted bonnet type valves increased in size and wall thickness, although

Hobbs disclosed the alleged invention of Patent No. Re. 23,272 to each of these manufacturers and gave them colored copies of drawings showing the invention. The defendant Powell built the patented valves. These valves have successfully continued in service.

22. The U. S. Navy investigated the Hobbs patents on two occasions, authorized the payment of royalty to Hobbs under the patents in suit on pressure seal valves which it purchases, and now includes them in its specifications.

23. There has been wide public adoption and use of the alleged invention of Patent No. Re. 23,272 and extensive commercial success.

24. The Diamond Alkali plant in which the valves of Patent No. Re. 23,272 were first tried out went into operation on June 3, 1939, and thereafter continued to successfully operate in said plant.

25. Each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272 claims a valve including various of the common valve elements mentioned in Findings 7 and 8 above, together with elements to effect a pressure seal including an abutment member, an inner member and a gasket, and, in instances, means for creating an initial seal between one of the closure members and the valve body.

26. Prior to February, 1938, the use of internal pressure seals in various pressure vessels was known to the art. A characteristic of each of the prior art internal pressure seals was that as pressure within the vessel or valve increased, a tighter seal between cover and body was effected. The patent to Murphy No. 1,350,066, the patent to Bredtschneider No. 2,029,606, and the Universal Oil Products autoclave prior use and knowledge by Mavity are examples of such internal pressure seals which have abutment members, inner members, gaskets, and means for creating initial seal, generally similar to and the equivalent of the corresponding elements disclosed in Patent Re. 23,272.

27. Each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272

claims an aggregation of old and well known elements, each of which performs in the aggregation no function which it had not theretofore performed outside the claimed aggregation; there is no interaction between the various valve elements on the one hand, and the closure elements on the other, the valve elements performing their functions in the old manner regardless of the specific type of closure means employed. Likewise the closure elements operate in the same manner to produce the same result regardless of whether they be associated with the valve elements or with other corresponding elements in prior pressure vessels.

28. Each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272 is invalid because it claims the elements of prior art valves referred to in Findings 7, 8 and 9 above with only substitution of an alternative form of joint between the body and the member or members closing the opening in the body through which the internal parts of the valves were inserted, which substitution does not affect the construction, operation or function of the other elements of the valve.

29. As early as 1929 with the issuance of the British counterpart (Ex. 108) of the Bredtschneider United States Patent No. 2,029,606, the art knew that a high pressure joint corresponding in detail to that of Hobbs' alleged conception drawing and to that of accused valves forms 3, 4 and 5 (Ex. 80, 81 and 82) was available for pressure vessels, one type of which is a valve.

30. The Bredtschneider Patent No. 2,029,606 and thirteen foreign counterparts were owned in part by Friedrich Uhde, who subsequent to 1932, after building and testing several pressure vessels incorporating the Bredtschneider joint, manufactured and shipped from his plant in Germany several devices to foreign countries of Europe, and to Japan and Manchuria. Uhde advertised the Bredtschneider high pressure joint in the United States and contacted several large companies to interest them in the joint, one of which was the Locomotive Finished Material Company of Atchison, Kansas. In 1936, Dr. Charles Pfeiffenberger of New York was made Uhde's United States representative to secure licenses under the Bredtschneider patent, and Pfeiffenberger was supplied by Uhde with drawings of pressure vessels of various types, including valves incorporating the Bredtschneider seal. Prior to February 23, 1938, Pfeiffenberger contacted many large companies in the United States, including Bethlehem Steel, E. I. du Pont Company, Standard Oil Development Company, Babcock & Wilcox, Combustion Engineering, Schutte & Kierting, the defendant The William Powell Company and many others, and exhibited to many of these companies the Uhde drawings.

31. An advertisement by Pfeiffenberger in the March, 1937 issue of Chemical & Metallurgical Engineering magazine offering licenses under the Bredtschneider Patent No. 2,029,606 disclosed an internal pressure seal and stated that it had been used or was being used in valves. The use of the joint there illustrated in place of the commonly used joints would produce a valve which would be the identical structure claimed in each of Claims 1 to 6, 12 to 15, 17, 19, 20, 22 and 23 and the full equivalent of the structures claimed in Claims 7 to 10, inclusive, of Patent Re. 23,272.

32. An autoclave which included a pressure seal closure or joint identical with the closure or joint specified in each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272 was manufactured in Germany by Uhde's company and shipped in December, 1934 to Universal Oil Products Company at Riverside, Illinois, where it was used by Dr. Mavity, an employee of Universal Oil Products Company, at least from February 15, 1935 to March 15, 1935, in research work which he was conducting for the company. The autoclave was stated to be suitable for pressure up to 300 atmospheres (4,500 pounds per square inch) and temperatures up to 430° C. (806° F.). Dr. Mavity's use in-

cluded pressures up to 1,900 pounds per square inch and temperatures of 806° F. That use of the autoclave was a public use in the United States more than two years prior to February 23, 1940.

33. Nothing is disclosed in Patent Re. 23,272 which was not known to the art more than two years prior to February 23, 1940. Each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272, claims a valve structure comprising old and well known valve elements together with an old and well known pressure seal joint. The structure claimed by each of said claims would have been obvious to those skilled in the art more than two years prior to February 23, 1940.

34. Subsequent to the time that the plaintiff, James C. Hobbs, saw the advertisement in the March, 1937 issue of Chemical & Metallurgical Engineering magazine and consulted with its author, Pfeiffenberger, the Diamond Alkali Company asked the defendant, The William Powell Company, to submit designs for steam and water valves to be purchased by Diamond Alkali Company. The William Powell Company produced numerous drawings into which its personnel incorporated much engineering and designing effort and skill, and Hobbs and other employees of Diamond Alkali joined in discussion and selection of various features which were to be incorporated in the composite valve assemblies. During discussions relating to such valves between employees of Diamond Alkali Company, Hobbs' employer, and employees of The William Powell Company, Hobbs expressed preference for valves embodying pressure seal joints of the type illustrated in the advertisements. Such valves were developed by The William Powell Company in consultation and correspondence with employees of the Diamond Alkali Company, including the plaintiff, and with representatives of other concerns, including a foundry, a packing manufacturer, and a manufacturer of stainless steel. Subsequently, The William Powell Company manufactured and sold such valves to the Diamond Alkali Company.

35. The valves described in Patent Re. 23,272 would not be usable at temperatures in excess of about 700° F.

36. Prior art valves having bolted bonnets and welded bonnets were employed under temperatures and pressures in the same range as those under which valves having pressure seal bonnets are used today.

37. Bolted bonnet valves have not been supplanted by valves of Patent Re. 23,272 and are still in use and offered for use as particularly well suited for high pressure, high temperature services.

38. Bolted bonnet valves are all-purpose valves designed for and capable of all service conditions. Such valves are manufactured and sold to meet industry standards which pressure seal valves, such as those made by plaintiff's licensees and by the defendant, The William Powell Company, do not meet.

39. Welded bonnet valves were used in the prior art for high pressure and high temperature service and are being manufactured and sold for such service today where they will meet conditions as severe or more severe than those met by pressure seal bonnet valves like those manufactured by plaintiff's licensees and the defendant, The William Powell Company.

40. The valves made and sold by The William Powell Company to defendant, Wisconsin Power and Light Company, which are here charged to infringe, were manufactured, sold and shipped between April and July, 1949, prior to the filing of the application for re-issue which matured as Patent Re. 23,272.

41. Patent Re. 23,272 fails to define form, size, shape or materials of valve parts, and fails to define form, size, shape or materials of joint parts. Selection of all factors is left to the man skilled in the art.

42. During the prosecution of the application which matured as Patent 2,321,597, later reissued as Re. 23,272, after all claims had been rejected by the Patent Office as unpatentable over Convert German Patent No. 61,274, the

claims were rewritten and a limitation added as to relative non-rotatability of certain elements as follows:

"* * * said outer and inner members and packing being non-rotatable relative to each other, * * *." (Claims 1, 2, 3, 4, 5, 6, 11 and 12)

"* * * means * * * for preventing relative rotation of said ring, packing and guiding member * * *." (Claims 7, 8 and 9)

"* * * * ring means * * * for preventing relative rotation of said members and packing * * *." (Claim 10)

Thereafter, during the reissue application which resulted in Patent Re. 23,272 in suit, this element of the claims was further changed to read as follows:

"* * * said outer and inner members and packing being nonrotatable relative to each other during the creation of said initial sealing pressure * * *." (Claims 1, 2, 12, 13, 14, 15, 22 and 23)

"* * * said outer and inner members and packing being non-rotatable relative to each other, * * *." (Claims 3, 4, 5, 6, 19 and 20)

"* * * while avoiding relative rotation of said ring, packing and guiding member, * * *." (Claims 7, 8, 9 and 17)

"* * * while avoiding relative rotation of said members and packing, * * *." (Claim 10)

The specification of Patent Re. 23,272 does not mention relative non-rotatability of such elements and is lacking disclosure of any mechanical elements or means corresponding to said limitations in the claims.

43. The accused valve, Form 1, does not have outer and inner members having telescoped annular portions, nor an outer member which is in the valve receiving opening, nor an outer member which is between the inner member and the body, nor outer and inner members and gasket which are non-rotatable relative to each other, nor valve actuating means carried by the outer members or connected to the body, as specified in Claims 1 to 4, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272.

44. The accused valve, Form 2, does not have outer and inner members which are telescoped, or an inner member slidably mounted in the outer member, and no means is provided for preventing rotation between the inner member, the gasket, the gasket thrust washer, and the body lock nut or yoke arm, as specified in Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272.

45. The accused valves, Forms 3, 4 and 5, do not have outer and inner telescoped members, nor packing between axially opposed surfaces of inner and outer members, or abutting against any ring screw-threaded within the valve receiving opening, nor a bonnet (yoke arm) secured to the outer member, nor valve actuating means carried by an outer member, as specified in Claims 1 to 6, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272.

46. Claims 1, 5, 6 and 7 of Patent Re. 23,137 each relates to a fluid seal and defines a seal in which a wedge-shaped gasket is employed between an inner cylindrical surface on a body and a conical surface on an inner member to be sealed to the body, the gasket being formed with a smaller angle between its faces than that between the cylindical and conical surfaces being sealed.

47. Pressure seal joints in which a wedge-shaped sealing ring was employed to seal between a conical member and a cylindrical surface and in which there was a differential angle between the sealing ring and one of the surfaces, were known to the art long prior to August 15, 1943. An example of such a joint was shown in the proceedings of the American Academy of Arts and Sciences, 1911, in an article by Dr. P. W. Bridgman. This same disclosure was republished in 1931 in "The Physics of High Pressure" by Dr. P. W. Bridgman, and again in 1934 in "The Design and Construction of High Pressure Chemical

Plant" by Harold Tongue. The art also had knowledge of other structures employing a similar line contact between the sealing ring and the members being sealed, an example being the Bredt-schneider Patent No. 2,029,606.

48. On August 19, 1938, the General Electric Company sold and delivered to the Diamond Alkali Company a turbine having a throttle valve which embodied a pressure seal joint having a differential angle between the wedge-shaped metallic sealing ring and the bonnet which responded fully to Claims 1, 5, 6 and 7 of Patent Re. 23,137.

49. In the year 1938, The William Powell Company sold and delivered to the Diamond Alkali Company steam valves which embodied a pressure seal joint having a differential angle between the metallic ring, the bonnet and the body and which responded fully to Claims 1, 5, 6 and 7 of Patent Re. 23,137; prior to the sale of said valves, The William Powell Company made and successfully publicly tested in 1938, at the West End Station of the Cincinnati Gas & Electric Co., Cincinnati, Ohio, seals which embodied each of the elements of each of Claims 1, 5, 6, and 7 of Patent Re. 23,137.

50. Nothing is disclosed in Patent Re. 23,137 which was not known to the art more than one year prior to August 15, 1944. The structure claimed by each of Claims 1, 5, 6 and 7 of Patent Re. 23,137 would have been obvious to, and was known by, those skilled in the art more than one year prior to August 15, 1944.

51. The accused valves, Forms 1, 2, 3, 4 and 5, employ a sealing ring which seals between a conical surface on the bonnet and a conical surface on the body. Those valves do not have means for, nor do they seal, between the bonnet and a cylindrical surface in the body as specified in Claims 1, 5, 6 and 7 of Patent Re. 23,137.

## Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter hereof.

2. The improvement of one part of an old combination gives no right to claim that improvement in combination with the old parts which perform no new function in the combination.

3. Each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272 is invalid because drawn to an exhausted combination.

4. Any patented device, all of the elements of which are old and each of which performs the same function taught by the prior art, fails as an invention.

5. Each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272 is invalid for lack of invention.

6. Each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272 is invalid for anticipation by and lack of invention over the prior art.

7. Each of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272 is invalid because the patentee, Hobbs, was not the original or first inventor of what is disclosed in that patent and claimed in those claims.

8. Claims 1 to 3, 7 to 10, 12, 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272 are not enforceable against defendants, Wisconsin Power and Light Company and The William Powell Company.

9. Patent Re. 23,272 is invalid because the specification thereof does not contain a written description of the alleged invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, to make and use the same, and does not set forth the best mode of carrying out the alleged invention.

10. The defendants have not infringed any of Claims 1 to 10, 12 to 15, 17, 19, 20, 22 and 23 of Patent Re. 23,272.

11. Each of Claims 1, 5, 6 and 7 of Patent Re. 23,137 is invalid for anticipation by and lack of invention over the prior art.

12. Claims 1, 5, 6 and 7 of Patent Re. 23,137 are invalid because devices which they are claimed to cover were in public use and sold in this country more than one year prior to August 15, 1944, the

date of application for Patent No. 2,443,-197, of which Patent Re. 23,137 is a reissue.

13. The defendants have not infringed any of Claims 1, 5, 6 and 7 of Patent Re. 23,137.

14. Plaintiff's complaint should be and is hereby dismissed, with costs.